**MOTOROLA CREDIT CORPORATION and Nokia Corporation, Plaintiffs,**

v.

**Kemal UZAN, et al., Defendants.**

**No. 02 CIV. 666(JSR).**

United States District Court, S.D. New York.

Aug. 8, 2003.

Steven Davidson, Esq., Gordon M. Clay, Esq., John O'Connor, Esq., Howard Stahl, Esq., Steptoe & Johnson LLP, Washington, DC, for Motorola (Attys admitted per pro hac vice order dated February 6, 2002).

Mishell B. Kneeland, Esq., Paul Fishman, Esq., Friedman Kaplan Seiler & Adelman LLP, Allison G. Kort, Esq., Jason Brown, Esq., Holland & Knight LLP, New York City, for Nokia.

Robert F. Serio, Esq., Mark Holton, Esq., Prasanth R. Akkapeddi, Esq., Gibson, Dunn & Crutcher, David Rosenberg, Esq., Marcus, Rosenberg & Diamond LLP, New York City, Stanley R. Mortenson, Esq., James R. Heavner, Jr., Esq., Baker Botts LLP, The Warner, Washington, DC, for individual Cem Uzan and Murat Hakan Uzan defts and Counterplaintiff—Counterclaims dismissed per dismissal of counterclaims dated November 12, 2002.

Kenneth M. Bailo, Esq., Emmet, Marvin & Martin, LLP, New York City, for defts Kemal Uzan, Cem Cengiz, Murat Hakan Uzan, Melahut Uzan and Aysegul Akay, Atty admitted pro hac vice June 26, 2002.

Brian V. Otero, Esq., Hunton & Williams, New York City, Jennifer Culotta, Esq., David F. Geneson, Esq., Hunton & Williams, Washington, DC, for counter defendant Keith Bane admitted pro hac vice per order dated November 8, 2002.

Andrew N. Vollmer, Andrew Weissman, Wilmer, Cutler & Pickering, Washington, DC, both attys admitted pro hac per order dated October 4, 2002 for third party ABN AMRO Bank.

Timothy P. Harkness, Davis Polk & Wardwell, New York City, for Deloitte & Touche LLP appeared at hearing on February 19, 2003.

HSBC, William O'Brien, Kronish Lieb, Weiner & Hellman, LLP, New York City.

## MEMORANDUM ORDER

RAKOFF, District Judge.

Defendants move under Rules 62(c) and 62(d), Fed.R.Civ.P., *either* for a stay pending appeal of execution of the judgment entered August 1, 2003 pursuant to the Order and Opinion dated July 31, 2003 (the "July 31 Order"), full familiarity with which is here presumed; *or*, failing that, for a temporary stay until the Court of Appeals "has had a fair opportunity" to consider a comparable motion under Rule 8, Fed. R.App. P. *See* Notice of Motion, dated August 5, 2003, at 1.

As defendants note, a court, in determining whether a stay pending appeal is appropriate, must first consider "whether the stay applicant has made a strong showing that he is likely to succeed on the merits . . . ." *Hilton v. Braunskill*, 481 U.S. 770, 770, 107 S.Ct. 2113, 95 L.Ed.2d 724 (1987). *See* Defendants' Memorandum of Law In Support Of Defendants' Motion For Stay ("Def.Mem.") at 2. Yet while recognizing this high standard, defendants, in their motion papers, do little more than recite in conclusory fashion numerous points on which the Court has ruled against them, apparently in the belief that quantity can substitute for quality. Mere conclusions, however, whether applied to one issue or many, do not constitute any kind of showing, let alone the requisite "strong showing." Accordingly, defendants have not even met the first requirement of a stay pending appeal.

Nonetheless, in recognition of the substantial relief embodied in the Court's judgment, a few words may be said about each of the seven issues that defendants asserts were "errors affecting the final judgment . . . ." Def. Mem. at 3.

(1) "Denial of Arbitration Rights" (Def. Mem. at 3–4). Defendants allege that the Court erred in denying defendants' motion

to compel arbitration because the Court "mistakenly distinguished" relevant Second Circuit precedent, Def. Mem. at 4; but they fail to specify in what respects the distinctions were mistaken. There is no doubt that the arbitration issue was one of the more difficult issues confronting the Court, but the Court's analysis of that issue was fundamentally premised on the bedrock principle, repeatedly endorsed not only by the Second Circuit but also by the Supreme Court, that arbitrability is ultimately a matter of contract, that is, of who agreed to what. As explained in the July 31 Order at 28–35, the parties here never agreed to anything; the defendants here have no equitable standing to try to take advantage of what the plaintiffs agreed to with non-party Telsim; and, in any event, what the plaintiffs agreed to with Telsim does not extend to the instant dispute, especially in the case of plaintiff Motorola Credit Corporation ("MCC"). Defendants' instant papers address none of this.

■ It remains only to add that even if one were to assume for the sake of argument that the case should have been referred to arbitration, this would not warrant a stay of the injunctive relief embodied in the judgment, since such relief would still be authorized "in aid of arbitration." *See* July 31 Order at 36.

(2) "Inappropriate Exercise Of Supplemental Jurisdiction" (Def. Mem. at 4–5). While . the defendants assert that "this Court never had original jurisdiction over Plaintiffs' RICO claims" (Def. Mem. at 4), they give no ground whatever for their conclusory assertion (Def. Mem. at 4) that this is because the instant case is "[u]nlike the situation" in *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113 (2d Cir.2003), on which the Court relied. *See* July 31 Order at 15. In the Court's view, *Lerner* is not only directly apposite but also reflects underlying Supreme Court precedent. Moreover, implicit in the Court of Appeals' earlier

decision in the present case is a recognition that the District Court had original jurisdiction over the RICO claims, since the Court of Appeals, despite dismissing those claims, remanded to this Court with direction that it determine whether to exercise supplemental jurisdiction "pursuant to 28 U.S.C. § 1367(c)," *Motorola Credit Corporation v. Uzan*, 322 F.3d 130, 137 (2d Cir.2003), a section that would not be applicable if there had not been original jurisdiction. In short, on this issue defendants' position appears to this Court to be wholly without merit.

(3) "Conduct of Improper 'Trial'" (Def. Mem. at 5). Defendants claim that the trial of this case occurred after the Court "was divested by the Federal Arbitration Act of jurisdiction to proceed"; that, in any event, the trial focused on the RICO claims that were later held to be unripe; and, finally, that the defendants were barred from participating by one or more Turkish injunctions. Def. Mem. at 5.

The first argument is simply a reiteration of defendants' point (1), *supra*, that the case should have been referred to arbitration. Listing it here as a separate point gives it no greater or lesser weight.

The second argument (that the trial focused on the RICO claims) has no validity whatever, since at all times the trial was a trial of all claims, each of which had to be analyzed separately. Moreover, virtually all the proof relevant to the RICO claims was also relevant to the claims of fraud and civil conspiracy.

Finally, the third argument (that the defendants were barred from participating in the trial by Turkish injunctions)—besides being largely a rehash of the separate argument defendants make in their point (4), *infra*, that the Court failed to respect foreign law—is here a complete irrelevancy, because (a) the defendants never moved to suspend the trial on this basis; (b) the injunctions here referred to

were procured by the defendants themselves in violation of this Court's prior orders, *see* July 31 Order at 27; Memorandum Order, dated January 6, 2003, at 3; (c) the injunctions in question actually purported to enjoin this Court itself from proceeding with this case and thus were void on their face; and (d) the injunctions in question were overturned by the Turkish Supreme Court of Appeals on February 25, 2003, with that court noting that the issuing court's actions were "totally lack[ing in] authority," "illegal," "impossible and inappropriate," and "creat[ed] doubt about the trustworthiness of the [issuing] judge." *See* translation of the decision, Exhibit 2 to Declaration of Gordon M. Clay, annexed to Plaintiffs' Memorandum Of Law In Opposition To Defendants' Motion For Stay Without Bond ("Pl. Mem."). Additionally, it should be noted that, in fashioning a trial in these circumstances, the Court, *sua sponte*, afforded the absentee defendants further protection by relying heavily on the evidence adduced at the earlier six-day preliminary injunction hearing and two-day contempt hearing, at both of which defendants appeared and fully contested what, from a factual standpoint, were the same issues raised at trial.

(4) "Failure to Respect Foreign Law" (Def. Mem. at 5–6). Defendants' next assignment of error is the Court's alleged failure to defer to various other Turkish injunctions, especially the "multiple injunctions ... issued by Turkish courts enjoining Defendants from transferring shares of Telsim stock." (Def. Mem. at 6). While the sordid history of the defendants' collusive procurement of these injunctions has been largely described in prior rulings of this Court, it may be well to revisit a few of the low points.

After initially ordering defendants to transfer the Telsim collateral to the registry of this Court, the Court suspended that requirement pending a full evidentiary hearing on the requested preliminary injunction. *See* Memorandum Order, dated February 14, 2002. Following several days of testimony, with witnesses called by both sides, that hearing concluded on April 18, 2002, at which time the Court reserved decision. On or about the very next day, *see* July 31 Order at 47, a supplier of Telsim, nominally suing Telsim for relatively modest amounts, obtained an *ex parte*, uncontested injunction barring the transfer of Telsim stock to this Court. At least two other such injunctions were thereafter obtained by similar suppliers in other parts of Turkey. *See* Order, dated August 22 2002, at 9–10. Although fully aware of these injunctions, the defendants expressly ordered their United States counsel not to reveal them to this Court. *See* July 31 Order at 47. Only after this Court issued its order granting the preliminary injunction and ordering transfer of the shares did defendants reveal the Turkish injunctions, contending that they were now barred from transferring the shares. *Id.* at 47, 143.

Defendants nonetheless assured this Court that they would take meaningful steps to overturn or modify the Turkish injunctions (which, seemingly, had no supportable rationale, since the amounts allegedly owed the suppliers could easily be satisfied by ordinary bonds). *See* Order, dated August 22, 2002, at 11–12. Subsequent evidence, however, revealed that the defendants only made a patently sham attempt to do so, thus providing further evidence that, as this Court subsequently held, the injunctions were collusively procured. *Id.*[1]

---

**1.** More generally, the degree to which defendants have misled this Court is, frankly, unparalleled in this Court's experience. Nor is this conclusion limited to this Court. Magistrate Judge Maas, to whom much of the dis-

Moreover, any doubt about the defendants' hypocrisy and contumacious intent was laid to rest when the Court suggested that, in place of the transfer of Telsim stock, defendants simply post a bond in this Court. *See* Order, dated October 15 2002, at 2 n. 1. With virtually no explanation, defendants declined to post such a bond, in any amount, preferring to continue their contempt of court.

Now, in their most recent papers, defendants submit an affidavit of Turkish counsel averring that since the injunctions in question were not appealed, the injunctions have now become final, and that therefore this Court's latest order to defendants to take the necessary steps to undo the injunctions comes too late. But, of course, the failure of defendants to appeal the injunctions in question was not only itself a violation of earlier orders of this Court but, more importantly, is just one more proof of the collusive nature of the injunctions.

Without reiterating further the many other such examples described in the prior orders of this Court, the point is that the evidence is plain that the defendants undertook fraudulent and collusive actions in Turkey to procure sham injunctions whose sole purpose was to avoid compliance with this Court's orders and proceedings, and that accordingly the claim that this Court's disregard of defendants' machinations somehow constitutes error is without substance.

(5) "Entry of Judgment Against Non-Parties" (Def.Mem.6–7). The defendants next claim that the "[t]he Court has entered judgment for over $4 billion against 130 companies," Def. Mem. at 6, most of which were not parties to the case, and that it has done so without particularized

evidence sufficient to pierce the corporate veil. *Id.* This is doubly erroneous. First, the Court only entered judgment against the parties to this case. Second, the Court held that such judgment could be collected not only from the defendants' personal assets but also from assets of entities over which the defendants "exercise complete domination and control and through which domination defendants committed the foregoing frauds against plaintiffs," July 31 Order at 172, thus satisfying the two classic indicia of veil-piercing. *See, e.g., Matter of Morris v. N.Y. State Dept. of Taxation and Fin.,* 82 N.Y.2d 135, 603 N.Y.S.2d 807, 623 N.E.2d 1157, 1160–1161 (1993). The Court made detailed findings, moreover, that at least 130 of defendants' companies, listed by name, satisfied these criteria because the defendants operated their entire economic empire as a single enterprise, totally controlled by them, and used by them to disguise the transfer of monies and assets. *See* July 31 Order at 67–81. While, obviously, attachments and the like are not self-executing remedies, and thus (as has already occurred in this case) any entity whose assets are attached has ample opportunity to contest the attachment as to it, the strong evidence that the Uzan defendants make use of their tightly-controlled web of companies as a device to facilitate their frauds is more than sufficient to justify the aforementioned order.

(6) "Improper Equitable Judgment" (Def. Mem. at 6). Defendants next argue that if they fail to comply with the Court's direction that they promptly transfer Nokia's portion of Telsim stock (7.5%) to the registry of this Court, then, under the Court's order, they will suffer as a sanc-

covery in this case was referred, ultimately concluded that the defendants had been "lying to the Court since I got involved in this case." Transcript, Hearing of November 18,

2002, at 4. The English Court that imposed criminal contempt terms of imprisonment on two of the defendants reached similar conclusions. *See* July 31 Order at 151–53.

tion a judgment of $1.7 billion, which is twice what Nokia is owed and "bears no relation to the harm Nokia would allegedly suffer should Defendants not transfer 7.5% of Telsim's shares to the registry of the Court." (Def. Mem. at 7).

To begin with, this point only becomes relevant if defendants once again act in contempt of the Court's orders to transfer Telsim stock, the only impediment to which is the collusively obtained injunctions that defendants could readily satisfy by paying their suppliers. But as already indicated, defendants have repeatedly evidenced their contempt for the prior such orders of the Court, refusing even the alternative of posting a bond in lieu of transferring the shares.

Thus, to have any hope of compelling compliance, as well as of compensating Nokia for losses sustained, the Court must resort to more stringent measures. *See United States v. United Mine Workers of America,* 330 U.S. 258, 303–304, 67 S.Ct. 677, 91 L.Ed. 884 (1947). Since the Telsim stock was supposed to compensate Nokia for the net monies owed in event of default, and since defendants have refused to provide meaningful discovery as to the financial worth of Telsim (and therefore the value of its stock), a reasonable measure of the compensatory aspect of the sanction is the net monies owed plus interest, and a reasonable measure of the additional amount needed to coerce compliance is to double that amount, which, as set forth in the July 31 Order at 171, is how the $1.7 amount was arrived at. (By contrast, in *United Mine Workers,* the coercive portion of the sanction award was a full four times the compensatory portion. *Id.* at 305, 67 S.Ct. 677.) Accordingly, the $1.7 billion sanction is both well grounded and fully within accepted limits.

(7) "Substantial Remedial Defects" (Def. Mem. at 7–8). Finally, in the most conclusory of all their points, defendants claim that the injunctive relief granted to MCC "is an improper adjunct to the $4 billion in monetary damages" (Def. Mem. at 7) because a treatise on equitable remedies says that it is "not appropriate," *id.,* and that, furthermore, the punitive damages award somehow violates Illinois law and due process. This is absurd. The injunctive relief largely consists of the classic relief of making available to MCC for satisfaction of its monetary judgment the collateral in which it had an interest or, in light of defendants' conversion of the collateral, the converted equivalent thereof; and the punitive damages are a very modest multiple of the compensatory damages. *See* July 31 Order at 167–69.

In sum, defendants have not even satisfied the first requirement of a stay pending appeal, *i.e.,* a strong showing of success on the merits. In light of the history of this case, it is also clear that they likewise cannot satisfy at least two of the three additionally required elements, *i.e.,* avoiding substantial injury to the adversary parties and fulfilling the public interest. *See Hilton v. Braunskill,* 481 U.S. 770, 776–77, 107 S.Ct. 2113, 95 L.Ed.2d 724 (1987).[2] But the problem of injury to plaintiffs might be largely obviated, at least as to MCC, if defendants were willing to post a bond equal to the amount of the judgment, *i.e.* $4.2 billion. Pleading a kind of billionaires' poverty, defendants claim this is beyond their means—though their repeated failure to provide meaningful financial discovery makes this claim impossible to evaluate. Nonetheless, plaintiffs, in an effort to expedite matters, have agreed to accept a bond in the much-

**2.** It is also doubtful to what extent defendants can satisfy the other element, *i.e.,* irreparable injury to the party seeking the stay, since defendants' prior conduct suggests that they do not intend to satisfy the judgment in any event.

reduced sum of $1 billion. *See* Pl. Mem. at 20. Yet defendants, incredibly, maintain they should not have to post any bond at all.

 Consequently, for all the foregoing reasons, the prong of the instant motion requesting a general stay pending appeal is hereby denied. With respect to the second prong requesting a short-term stay, however, the Court agrees to stay execution of judgment for an additional week, that is, until August 15, 2003. If, during the week, defendants post a supersedeas bond of $1 billion, then, on consent, the Court will stay execution of the judgment pending appeal. Alternatively, even if defendants do not post such a bond, the delay of one week will give them ample time to apply for a stay to the Court of Appeals.

SO ORDERED.