388 F.3d 39
 MOTOROLA CREDIT CORPORATION and Nokia Corporation, Plaintiffs-Appellees-Cross-Appellants,
v.
Kemal UZAN, Cem Cengiz Uzan, Murat Hakan Uzan, Melahat Uzan, Aysegul Akay, Antonio Luna Betancourt, Unikom Iletism Hizmetleri Pazarlama A.S., Standart Pazarlama A.S., and Standart Telekomunikasyon Bilgisayar Hizmetleri A.S., Defendants-Appellants-Cross-Appellees.
 No. 03-7792(L).
 No. 03-7794(CON).
 No. 03-7796(CON).
 No. 03-7878(XAP).
 United States Court of Appeals, Second Circuit.
 Argued: June 23, 2004.
 Decided: October 22, 2004.
 
 Appeal from the United States District Court for the Southern District of New York, Jed S. Rakoff, J. COPYRIGHT MATERIAL OMITTED Floyd Abrams (R. Stan Mortenson, Baker Botts, L.L.P., Washington, DC, of counsel), Cahill, Gordon & Reindel, L.L.P., New York, NY, for Defendants Cem Cengiz Uzan and Murat Hakan Uzan.
 Nathan Lewin (Robert F. Serio, Gibson, Dunn & Crutcher, L.L.P., New York, NY, of counsel), Lewin & Lewin, L.L.P., Washington, DC, for Defendants Kemal Uzan, Melabat Uzan, Aysegul Akay, and Antonio Luna Betancourt.
 Carter G. Phillips (Bradford A. Berenson, of counsel), Sidley, Austin, Brown & Wood, L.L.P., Washington, DC, for Defendants Unikom Iletism Hizmetleri Pazarlama A.S., Standart Pazarlama A.S., and Standart Telekomunikasyon Bilgisayar Hizmetleri A.S.
 Howard Stahl (Steven K. Davidson, Charles G. Cole, Bruce C. Bishop, of counsel), Steptoe & Johnson, L.L.P., Washington, DC (Craig A. Stewart, Anthony J. Franze, Arnold & Porter, L.L.P., Washington, DC, of counsel), for Plaintiff Motorola Credit Corporation.
 Jason Brown (David D. Howe, of counsel), Holland & Knight, L.L.P., New York, NY, for Plaintiff Nokia Corporation.
 Before: MINER, CALABRESI, and CABRANES, Circuit Judges.
 JOSÉ A. CABRANES, Circuit Judge.
 
 
 1
 This is an appeal brought by individual and corporate defendants who, the District Court found, swindled two large corporations out of well over $2 billion.[1] On appeal, defendants contend that the District Court lacked jurisdiction over this case and the parties to it on multiple grounds. They argue first that the District Court erred in denying their motion to compel arbitration. In the alternative, and assuming the case was not arbitrable, they claim that the District Court lacked jurisdiction to conduct a trial while an appeal was pending in this Court from the District Court's denial of their motion to compel arbitration; that the District Court abused its discretion by deciding unsettled questions of Illinois law after all the federal claims were dismissed; and that the Illinois claims brought by plaintiffs were not ripe for adjudication. Most defendants also claim that the District Court lacked personal jurisdiction over them.
 
 
 2
 Defendants also challenge some of the remedies imposed by the District Court after a trial in which they did not participate. Plaintiffs, in turn, cross-appeal on one issue, arguing that the District Court abused its discretion when it denied their motion to reinstate RICO claims that were previously dismissed at the behest of this Court.
 
 
 3
 For the reasons stated below, we reject each of defendants' challenges to the District Court's jurisdiction over this action, and we dismiss the cross-appeal as meritless. However, we vacate the judgment of the District Court to the extent that it (a) imposed a constructive trust, for the benefit of Motorola Credit Corporation, over 66% of the stock of a company controlled by defendants; (b) permitted plaintiffs to enforce their judgment against 130 nonparties to this litigation; and (c) awarded punitive damages to Motorola Credit Corporation in the amount of $2,132,896,905.66. Having vacated the first two remedies on the principal ground that the District Court did not make sufficiently specific findings to support them, we remand for proceedings consistent with this opinion. We also direct the District Court to reconsider its punitive damage award, which was inconsistent with due process requirements of the Constitution and Illinois law.
 
 I. FACTUAL BACKGROUND
 
 4
 The following facts are drawn principally from our Court's previous opinion in this case, Motorola Credit Corp. v. Uzan, 322 F.3d 130 (2d Cir.2003) ("Uzan I"), and from the District Court's opinion, Motorola Credit Corp. v. Uzan, 274 F.Supp.2d 481 (S.D.N.Y.2003) ("Uzan II"). Plaintiff Motorola Credit Corporation ("Motorola") is the financing affiliate of Motorola, Inc., which manufactures and services cellular telecommunications systems. Plaintiff Nokia Corporation ("Nokia") is another major telecommunications manufacturer. The individual defendants are members and a close associate of the Uzan family of Turkey, which controls, inter alia, companies called Telsim and Rumeli Telefon. Neither Telsim nor Rumeli Telefon is a party to this action. The Uzans also control companies called Standart Telekomunikasyon Bilgisayar Hizmetleri A.S. ("Standart Telekom"), Unikom Iletism Hizmetleri Pazarlama A.S., and Standart Pazarlama A.S. These companies are defendants in this action.
 
 
 5
 In 1998, Motorola lent Telsim $360 million to purchase cellular infrastructure and equipment from Motorola Ltd. (a separate entity), and $200 million to enable Telsim to acquire a 25-year nationwide cellular license for Turkey. As collateral, Rumeli Telefon, which then owned approximately 73.5% of Telsim, pledged 51% of Telsim's outstanding shares. In subsequent years, Motorola provided significant additional financing—eventually totaling approximately $2 billion—and the collateral pledged by Rumeli Telefon as security for the loan was increased to 66% of Telsim's outstanding shares. Each of Motorola's relevant agreements (the "Motorola Agreements") provides that it "shall be governed by and interpreted in accordance with the internal laws (without regard to the laws of conflicts) of Switzerland," and that the parties agree to arbitrate any dispute that "arises hereunder, or under any document or agreement delivered in connection herewith," before a three-person arbitration panel in Switzerland in accordance with the International Arbitration Rules of the Zurich Chamber of Commerce. Uzan II, 274 F.Supp.2d at 507.
 
 
 6
 Also in 1998, Nokia entered into a smaller but similar arrangement with Telsim and Rumeli Telefon. The initial loan was extended by ABN-AMRO Bank N.V., on behalf of Nokia and backed by the credit of Nokia. As security, Rumeli Telefon pledged 5% of Telsim's outstanding shares. In subsequent years, Nokia extended additional financing to Telsim, approximately $800 million in all, and Rumeli Telefon increased the pledged interest to 7.5% of Telsim's outstanding shares. Each of the relevant agreements (the "Nokia Agreements") provides that it "shall be governed by, and shall be construed in accordance with Swiss law," Uzan I, 322 F.3d at 133, and that the parties agree to arbitrate all disputes "arising between the Parties out of or in connection with this Agreement" before a three-member arbitration panel in Switzerland in accordance with the International Arbitration Rules of the Zurich Chamber of Commerce, Uzan II, 274 F.Supp.2d at 508. Of these loans from Motorola and Nokia, Telsim has repaid approximately $200 million since 1998, and only $5 million since mid-2000.
 
 
 7
 The District Court found that the defendants made numerous false statements designed to induce Motorola and Nokia to extend the loans at issue in this case. These false statements included, inter alia, "material false statements regarding the business practices and finances of Telsim, the value and security of the collateral, the uses to which prior loan proceeds had been put, the status of other financing for Telsim, the existence and value of offers to purchase part or all of Telsim, and the status of negotiations with third parties" to sell control of Telsim. Id. at 577.
 
 
 8
 The District Court also found that, at a special shareholders meeting of Telsim convened on April 24, 2001, the defendants substantially diluted the value of the collateral pledged to Motorola and Nokia. At the meeting, the shareholders tripled the number of outstanding Telsim shares. Although current shareholders were afforded preemption rights to purchase the newly issued shares, Rumeli Telefon (the largest shareholder) waived these rights. The Telsim shareholders then transferred Rumeli Telefon's waived preemption rights to defendant Standart Telekom (another Uzan-controlled company), which exercised those rights. As a result of this transfer, Standart Telekom raised its stake in Telsim from 0.32% to 66.48%, while Rumeli Telefon's holding (all of which had been pledged to Motorola and Nokia) was reduced from 73.63% to 24.54%.
 
 
 9
 On January 4, 2002, the Uzans staged another meeting of Telsim shareholders. At that meeting, the defendants passed a resolution that created privileged "Class A" shares, held by the Uzans, that were unencumbered by any pledge to Motorola or Nokia, and that gave Class A shareholders the authority to elect four of Telsim's five directors. Under Turkish law, these changes became effective when the resolution was duly registered in May 2002.
 
 
 10
 The District Court found that, in addition to diluting and destroying the plaintiffs' collateral, defendants filed false criminal charges against plaintiffs' senior executives, claiming that the executives engaged in "explicit and armed threat[s] to kill," blackmail, and kidnap members of the Uzan family. These charges were later dismissed by the Turkish criminal court on the ground that they lacked a factual basis.
 
 
 11
 The District Court's extensive findings are laid out in its meticulous 173-page opinion granting a judgment to Motorola and Nokia totaling more than $4 billion. For the purposes of this appeal, however, these detailed findings are for the most part irrelevant because the appeal is based principally on challenges to the District Court's jurisdiction over these actions.
 
 II. PROCEDURAL HISTORY
 
 A. Proceedings Before Final Judgment
 
 
 12
 In their complaint filed in January 2002, Motorola and Nokia alleged violations of RICO (Counts I-IV), Illinois state law (Counts V-VII, XI), the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(4) (Count VIII), and the Electronic Communications Privacy Act, 18 U.S.C. §§ 2511(1)(a), 2701(a)(2) (Counts IX-X). Motorola and Nokia also asked the District Court to impose a constructive trust over the stake in Telsim improperly acquired by Standart Telekom. In March 2002, defendants moved to dismiss the complaint and to compel arbitration. Plaintiffs, in turn, sought preliminary injunctive relief including, inter alia, the attachment of certain New York properties and the deposit in the District Court's registry of the Telsim shares pledged as collateral.
 
 
 13
 On or about April 19, 2002, while the District Court was considering plaintiffs' request for a preliminary injunction, the defendants obtained three injunctions from Turkish courts. These injunctions purported to prohibit the transfer of Telsim stock outside Turkey.
 
 
 14
 On May 9, 2002, following a six-day evidentiary hearing, the District Court granted plaintiffs' motion for a preliminary injunction, which directed the defendants "to deposit into the [District Court's] registry ... the shares of stock of Telsim ... held by defendant Standart [Telekom] ... and issued to Standart [Telekom] during a meeting of Telsim shareholders on April 24, 2001, comprising at least 73.5% of the shares of Telsim stock currently outstanding." The injunction also prohibited defendants from further diluting the pledged collateral. In violation of the injunction, defendants, who had claimed that the case should proceed in arbitration, did not deposit the requisite Telsim shares in the registry of the District Court. Indeed, the very day after the injunction was entered, defendants, in further contravention of the District Court's order, cancelled the voting rights of the plaintiffs' collateral.[2]
 
 
 15
 On May 21, 2002, the District Court issued an opinion stating its reasons for entering a preliminary injunction. Motorola Credit Corp. v. Uzan, 202 F.Supp.2d 239 (S.D.N.Y.2002). In that opinion, the District Court concluded, inter alia, that "the arbitration provisions of the Telsim contracts are a total irrelevancy" because the individual defendants, rather than Telsim, were the real parties in interest in this action. Id. at 251.
 
 
 16
 On May 22, 2002, defendants appealed the District Court's preliminary injunction. The appeal was assigned docket number 02-7566 in this Court, and our Court set an expedited briefing schedule. However, proceedings in the District Court were not stayed pending resolution of the appeal, and the District Court moved the case forward at a brisk pace. On August 22, 2002, the District Court held defendants in civil contempt and imposed a $31,000 fine on them. On September 30, 2002, the District Court (1) formally denied defendants' motion to compel arbitration, having already stated that the arbitration provisions at issue were not relevant or applicable; and (2) enjoined the defendants from pursuing pending Swiss arbitrations involving Telsim and Motorola.[3] On October 15, 2002, the District Court filed a Memorandum Order setting out more fully the bases for its September 30 Order.[4] The District Court then refused to stay its proceedings pending appeal of the denial of arbitration, reasoning that "none of the moving defendants is a party to the arbitrations in question" and, therefore, "the appeal is frivolous." See Motorola Credit Corp. v. Uzan, No. 02 CIV 666, 2002 WL 31426202, at *1 (S.D.N.Y. Oct.29, 2002). On October 30, 2002, defendants appealed from the District Court's September 30 Order and October 15 Memorandum Order, and their appeal was assigned docket number 02-9302 in this Court.
 
 
 17
 On November 27, 2002, a Turkish court issued yet another injunction, this one purporting to enjoin plaintiffs and the District Court itself from proceeding. On January 6, 2003, the District Court enjoined defendants from proceeding with the Turkish action and ordered them to take all steps necessary to dissolve the Turkish injunctions. On January 17, 2003, defendants arranged for 36 Telsim employees to obtain yet another injunction from the Turkish court purporting to stay all proceedings against the Uzans worldwide. Both the November 27, 2002 injunction and the January 17, 2003 injunction have since been lifted by Turkish courts.
 
 
 18
 Beginning February 10, 2003 and continuing through February 19, 2003, the District Court conducted a bench trial on the merits of plaintiffs' claims, while the appeals in docket numbers 02-7566 and 02-9302 were pending in our Court. Prior to trial, defendants issued several subpoenas and served document requests, and obtained more than 96,000 pages of documents from Motorola and Nokia. At the same time, however, defendants refused to appear for depositions, in violation of multiple court orders. Moreover, shortly before the trial began, defendants informed the District Court that, because it lacked jurisdiction over the actions ever since the notice of appeal from the September 30, 2002 order was filed, they would not appear, present evidence, or examine witnesses at trial.
 
 
 19
 On March 7, 2003, in Uzan I, a unanimous opinion, we consolidated the cases bearing docket numbers 02-7566 and 02-9302, and left intact the preliminary injunction entered by the District Court. See Motorola Credit Corp. v. Uzan, 322 F.3d 130, 137 (2d Cir.2003). However, we also concluded that, under First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 768 (2d Cir.1994), plaintiffs lacked statutory standing to bring their RICO claims because those claims were unripe. Uzan I, 322 F.3d at 135. In First Nationwide, our Court explained that "a cause of action does not accrue under RICO until the amount of damages becomes clear and definite," First Nationwide, 27 F.3d at 768, and, furthermore, that the "clear and definite" amount of damages suffered by a secured creditor who is fraudulently induced to make a loan "cannot be established until it is finally determined whether the collateral is insufficient to make the plaintiff whole, and if so, by how much." Id. Although we acknowledged in Uzan I that the corporate borrower (Telsim) is not a defendant in the present case, we concluded that, just as a creditor's RICO claims against a borrower would be abated to the extent that the creditor successfully foreclosed on collateral, so too would Motorola and Nokia's claims against the Uzans and the corporate defendants they control. See Uzan I, 322 F.3d at 136. Accordingly, we directed the District Court to dismiss the RICO claims for lack of statutory standing, and remanded the case to the District Court to revisit the question of whether to exercise supplemental jurisdiction over the lenders' remaining claims.
 
 
 B. Final Judgment
 
 
 20
 On July 31, 2003, after additional briefing relating to our Court's decision in Uzan I, the District Court filed a 173-page Opinion and Order addressing numerous jurisdictional issues as well as the merits of the plaintiffs' claims.
 
 
 21
 With respect to jurisdiction, the District Court granted the plaintiffs' motion requesting that the Court retain supplemental jurisdiction over the Illinois fraud claims. The Court also concluded that, in contrast to the RICO claims, the claims under Illinois law alleging common law fraud and civil conspiracy were ripe for adjudication. Finally, the Court concluded that it did not have jurisdiction over Motorola's remaining federal claims (under the Computer Fraud and Abuse Act and the Electronic Communications Privacy Act) because Motorola Credit Corporation had not shown that it—rather than its corporate parent—was the injured party.
 
 
 22
 Having asserted jurisdiction over the state law claims after our decision that the RICO claims were unripe and its own decision that it had no jurisdiction over the remaining federal claims in the complaint, the District Court proceeded to enter extensive findings of fact concerning the Uzans' conduct toward the plaintiffs. The key findings were that the defendants, in order to induce Motorola and Nokia to extend the loans at issue, made numerous false representations, including material false statements regarding the business practices and finances of Telsim, the value and security of the collateral, the status of other financing for Telsim, the existence and value of offers to purchase part or all of Telsim, and the status of negotiations with third parties. See Uzan II, 274 F.Supp.2d at 511-74.
 
 
 23
 Based on its findings of fact, the District Court determined that (1) it had personal jurisdiction over the defendants; (2) the defendants had committed common law fraud, promissory fraud, and civil conspiracy under Illinois law; and (3) Motorola and Nokia were entitled to a constructive trust over the functional equivalent of 73.5% of Telsim—Motorola to around 66% of the company, and Nokia to the rest.
 
 
 24
 The District Court proceeded to award compensatory damages to Motorola equal to the full amount of its loans to defendants plus prejudgment interest ($2,132,896,905.66), as well as punitive damages to Motorola equal to the same amount ($2,132,896,905.66). Pursuant to its imposition of liability based on plaintiffs' constructive-trust claim, the Court also granted both Motorola and Nokia equitable ownership of Telsim shares that are the functional equivalent of the original collateral, and ordered defendants to convey those shares to the registry of the Court. Notably, the Court determined also that plaintiffs could collect their judgments from any of the more than 130 corporate entities that it found were controlled by the Uzans, despite the fact that those entities are not parties to this litigation.[5]
 
 
 25
 Finally, in its July 21, 2003 Opinion and Order, the District Court entered several additional contempt sanctions. First, it provided that, since Nokia's only meaningful remedy was the constructive trust over the Telsim shares, if those shares were not handed over to the court registry within a week of the entry of judgment, another judgment would be entered in Nokia's favor requiring defendants to pay two times the outstanding loans to Nokia plus interest (for a total of $853,707,639.13). Second, because of their contempt of the Court's prior orders, Judge Rakoff ordered the individual defendants arrested if they entered the United States.
 
 
 26
 Final judgment was entered against defendants on August 1, 2003. On August 8, 2003, the District Court denied the defendants' motion for a stay of execution of the judgment. Motorola Credit Corp. v. Uzan, 275 F.Supp.2d 519 (S.D.N.Y.2003). However, the Court ruled that it would grant a stay conditioned on a partial bond of $1 billion. See id. at 524-25. Defendants did not, and have not to this day, put up the bond.
 
 
 C. Proceedings in this Court
 
 
 27
 Within days of the entry of final judgment in the District Court, defendants filed notices of appeal in this Court, along with an emergency motion for a stay of execution and a motion to expedite the appeal. On Tuesday, August 15, 2003, Judge Cabranes, hearing the emergency motions, issued an interim stay of execution until a motions panel could fully consider the motion for a stay at the beginning of this Court's August 2003 Term. Plaintiffs then filed a motion to dismiss the appeals pursuant to the fugitive disentitlement doctrine.
 
 
 28
 On September 26, 2003, a motions panel of this Court entered an order dismissing the individual defendants' appeal under the fugitive disentitlement doctrine, and denying as moot the individual defendants' motion for a stay. The motions panel also vacated the District Court's judgment against the corporate defendants, and remanded the case "so that the district court may determine whether the corporate defendants were alter-egos of individual defendants." On October 3, 2003, the individual defendants filed a petition for rehearing and rehearing in banc of the panel's September 26, 2003 order. They also withdrew their initial stay motion, and filed a new motion for a stay. On February 6, 2004, the motions panel issued an order denying both the motion for reconsideration and the motion for a stay.
 
 
 29
 On April 16, 2004, the motions panel entered an order (1) vacating the orders entered on September 26, 2003 and February 6, 2004, and directing that the matter be referred to a merits panel in the normal course; (2) referring the motion for a stay to the merits panel; and (3) reinstating the emergency stay entered in August 2003 "until the merits panel reaches a decision on the motion for a stay or on the merits." On May 7, 2004, the motions panel denied a motion brought by plaintiffs to vacate the stay, but granted their motion for an expedited appeal.[6]
 
 
 30
 We heard oral argument on the merits on June 23, 2004. After receiving supplemental briefing from the parties addressing, inter alia, several questions of Swiss law that bear on the arbitration-related issues presented for our consideration, we entered an order on August 11, 2004 altering the stay of the judgment that had been in place since April 16, 2004. That order provided:
 
 
 31
 The stay of the District Court's judgment in favor of Motorola Credit Corporation is hereby lifted, except insofar as the District Court (1) imposed a constructive trust over Telsim shares for Motorola's benefit, (2) awarded Motorola the sum of $2,132,896,905.66 in punitive damages, and (3) allowed Motorola to collect its judgment from parties other than the defendants. The stay of the District Court's judgment in favor of Nokia is hereby lifted, except insofar as the District Court allowed Nokia to collect from parties other than the defendants if the defendants do not transfer the requisite Telsim shares to the registry of the District Court.
 
 
 32
 Motorola Credit Corp. v. Uzan, No. 03-7792(L), Order of Aug. 11, 2004.
 
 
 33
 Having broadly recounted the almost Dickensian history of this case, we now turn to the merits of the individual and corporate defendants' appeals.[7]
 
 III. JURISDICTION
 
 34
 On appeal, defendants do not challenge the District Court's findings of fact, nor do they contest the legal conclusions regarding the substantive issues of liability that follow from those findings. Instead, they put forward an array of challenges to the District Court's jurisdiction over this case and the parties to it. Specifically, they argue that the District Court (a) erred in denying defendants' motion to compel arbitration; (b) lost jurisdiction to proceed after defendants filed a notice of appeal from the District Court's denial of their motion to compel arbitration; (c) abused its discretion when it exercised supplemental jurisdiction over exclusively non-federal claims based on considerations of efficiency and fairness to litigants; (d) erred when it concluded that plaintiffs' claims were ripe for adjudication under Illinois law; and (e) lacked personal jurisdiction over most of the various defendants. For the reasons stated below, we reject each of these arguments.
 
 
 A. Compelling Arbitration
 
 
 35
 Defendants claim that the District Court erred in denying their motion to compel arbitration. Reviewing this claim de novo, see Genesco, Inc. v. T. Kakiuchi & Co., 815 F.2d 840, 846 (2d Cir.1987), we conclude that the District Court correctly held that defendants, who were not parties to any agreement to arbitrate with plaintiffs, could not compel plaintiffs to arbitrate.
 
 
 36
 Defendants sought to compel arbitration under 9 U.S.C. § 206, part of Chapter 2 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 201 et seq. Chapter 2 of the FAA, which implements the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 3 (the "New York Convention"), applies to an arbitration agreement, like the Agreements at issue here, that is commercial and that is not "entirely between citizens of the United States." 9 U.S.C. § 202. Section 206 provides that "[a] court having jurisdiction under this chapter may direct that arbitration be held in accordance with the agreement at any place therein provided for...." 9 U.S.C. § 206. To determine whether to compel arbitration pursuant to Section 206, courts inquire "whether the parties agreed to arbitrate, and, if so, whether the scope of that agreement encompasses the asserted claims." David L. Threlkeld & Co. v. Metallgesellschaft Ltd., 923 F.2d 245, 249 (2d Cir.1991).
 
 
 37
 In this case, the parties did not agree to arbitrate. Defendants invoke the arbitration clauses in the Motorola Agreements and the Nokia Agreements, to which Telsim and Rumeli—but not any of the defendants—were signatories. Defendants seek to compel arbitration under two theories. First, they contend that the doctrine of estoppel prevents plaintiffs from resisting arbitration. See, e.g., Choctaw Generation Ltd. P'ship v. Am. Home Assurance Co., 271 F.3d 403, 404 (2d Cir.2001) (holding that a signatory to an arbitration agreement was "estopped from avoiding arbitration with a non-signatory `when the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed'" (quoting Smith/Enron Cogeneration Ltd. P'ship v. Smith Cogeneration Int'l, Inc., 198 F.3d 88, 98 (2d Cir.1999))). Second, they argue that a party that signs an arbitration agreement with a corporation is also bound to arbitrate with that corporation's agents. See Campaniello Imports, Ltd. v. Saporiti Italia, S.p.A., 117 F.3d 655, 668 (2d Cir.1997) ("`Courts in this and other circuits consistently have held that employees or disclosed agents of an entity that is a party to an arbitration agreement are protected by that agreement.'" (quoting Roby v. Corp. of Lloyd's, 996 F.2d 1353, 1360 (2d Cir.1993))).
 
 
 38
 Defendants did not raise in the District Court their second argument, based on Campaniello Imports, and so that Court only addressed their estoppel argument. The Court held that estoppel did not apply here because "the very allegations of the Complaint, let alone the overwhelming evidence now adduced in their support show that this is not a case of trying to plead-around an agreement to arbitrate but rather of directly suing the real culprits, the Uzans, who simply used Telsim as a front to commit the instant fraud." Uzan II, 274 F.Supp.2d at 505. The Court also held that estoppel, an equitable doctrine, was unavailable to defendants based on their misconduct both prior to and during the litigation, which left them with unclean hands. See id. Finally, Judge Rakoff observed that the agreements at issue contained Swiss choice-of-law clauses, and that Swiss law "strictly enforces privity of contract and generally prohibits nonparties from seeking to invoke contractual terms on their behalf." Id. at 506. Without addressing whether the choice-of-law clauses were an independent basis for denying arbitration, he stated that those clauses "reinforce[d] the appropriateness" of denying equitable relief to defendants.[8] Id.
 
 
 39
 Plaintiffs argue that we need not address the federal-law theories advanced by defendants under which a nonsignatory to an arbitration agreement may compel a signatory to arbitrate. They assert that Swiss law governs the issue of whether defendants may invoke the arbitration clauses and that, under Swiss law, defendants may not. Defendants respond that federal law controls issues of arbitrability, and that in any event, Swiss law would permit them to obtain arbitration.
 
 1. Choice of Law
 
 40
 Defendants moved to compel arbitration under Section 206, which permits a court to order that arbitration be held "in accordance with the agreement." 9 U.S.C. § 206. The agreements at issue here recite that they will be governed by Swiss law. See Uzan II, 274 F.Supp.2d at 506.
 
 
 41
 We have applied a choice-of-law clause to determine which laws govern the validity of an agreement to arbitrate. See Sphere Drake Ins. Ltd. v. Clarendon Nat'l Ins. Co., 263 F.3d 26, 32 n. 3 (2d Cir.2001). In Sphere Drake, we applied New York and New Jersey choice-of-law clauses to one party's claim that it was not bound by an arbitration agreement that its agent had signed while purportedly acting outside the scope of agency. See id.; see also Restatement (Second) of Conflicts of Laws § 218 (1971) (providing that the rules of conflicts of law apply to "[t]he validity of an arbitration agreement, and the rights created thereby"). More generally, a choice-of-law clause in a contract will apply to disputes about the existence or validity of that contract. See, e.g., Int'l Minerals & Res., S.A. v. Pappas, 96 F.3d 586, 592 (2d Cir.1996) (applying an English choice-of-law clause to an issue of contract formation).
 
 
 42
 Defendants claim that a choice-of-law clause does not govern questions of contract validity where the ultimate issue is one of arbitrability. They rely principally on decisions that apply federal law to the question of arbitrability despite the presence of a choice-of-law clause designating another forum's laws. See, e.g., Campaniello Imports, 117 F.3d at 659, 668-69 (applying federal law to an arbitration clause in a contract containing an Italian choice-of-law clause, without discussing Italian law). However, these authorities do not hold that a court must set aside a choice-of-law clause in determining arbitrability; instead, they appear to be cases where neither party raised the choice-of-law issue. See, e.g., Smith/Enron Cogeneration Ltd. P'ship v. Smith Congeneration Int'l, Inc., 198 F.3d 88, 96 (2d Cir.1999) ("While the language [of the agreement] might justify looking to Texas law ..., neither party argued that it applied. Thus, we will apply the body of federal law under the FAA.").
 
 
 43
 Defendants also argue that applying federal law to the interpretation of arbitration agreements is required to further the purposes of the FAA and to create a uniform body of federal law on arbitrability. Their uniformity argument has some force where the parties have not selected the governing law. But where the parties have chosen the governing body of law, honoring their choice is necessary to ensure uniform interpretation and enforcement of that agreement and to avoid forum shopping. This is especially true of contracts between transnational parties, where applying the parties' choice of law is the only way to ensure uniform application of arbitration clauses within the numerous countries that have signed the New York Convention. Furthermore, respecting the parties' choice of law is fully consistent with the purposes of the FAA. Cf. Volt Info. Scis., Inc. v. Bd. of Trustees, 489 U.S. 468, 479, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989) ("Where, as here, the parties have agreed to abide by [California] rules of arbitration, enforcing those rules according to the terms of the agreement is fully consistent with the goals of the FAA ....").
 
 
 44
 In short, if defendants wish to invoke the arbitration clauses in the agreements at issue, they must also accept the Swiss choice-of-law clauses that govern those agreements.
 
 2. Swiss Law
 
 45
 After oral argument, we requested supplemental briefing from the parties on various points of Swiss law and invited the parties to submit statements from experts. Plaintiffs submitted a Joint Declaration of Dr. Pierre Karrer, Dr. Franz Kellerhals, and Dr. Beat Denzler (the "Karrer Declaration"), while defendants submitted an Affidavit of Dr. Phillipe Schweizer (the "Schweizer Affidavit"). All of these experts are highly credentialed Swiss lawyers who have substantial experience with arbitration law.
 
 
 46
 Having reviewed these statements and their supporting authorities, we conclude that under Swiss law, defendants, as nonsignatories to the agreements, may not invoke the arbitration clauses contained in those agreements.
 
 
 47
 The Karrer Declaration, submitted by plaintiffs, concludes that under Swiss law, "a director, shareholder or employee of Telsim, or any other third party, would not be permitted to invoke the arbitration clause in the Finance Agreements." Karrer Decl. ¶ 16. Plaintiffs' experts admit that there are exceptions to this doctrine: where the nonsignatory is a successor in interest to a signatory, id. ¶¶ 18-20, or where the nonsignatory is willing to arbitrate. Id. ¶ 21. They cite a decision of the Swiss Federal Tribunal (the highest court in Switzerland), which provides, in relevant part: [I]n principle an arbitration clause is binding only on those parties which have entered into a contractual agreement to submit to arbitration, whether directly or indirectly through their representatives. Exceptions to this rule arise in cases of legal succession, retroactive approval of an arbitration clause or attempts to pierce the corporate veil of a legal entity in the case of abusive objections to the clause.
 
 
 48
 See Swiss Federal Tribunal, decision of May 19, 2003, 4C.40/2003, No. 4.1, appended to Karrer Declaration.[9]
 
 
 49
 Plaintiffs' experts state that "[t]here is no Swiss authority where a Non-Signatory has even tried to compel/invoke arbitration against a Signatory ...." Karrer Decl. ¶ 26. Defendants' expert, Dr. Phillipe Schweizer, does not reach any contrary conclusion. He reviews five decisions of the Swiss Federal Tribunal, each of which addresses attempts by a signatory to invoke an arbitration clause against a nonsignatory. Schweizer Aff. 3-5. The rule that emerges from these cases, and the declarations offered by the experts of both sides, is that a nonsignatory may be required to arbitrate in certain circumstances where it acts in bad faith. As Schweizer summarizes, "[a] person who adopts a certain mode of behavior, which clearly reflects his objective intentions, recognizable as such by his contractual partners and by third parties, may not, as a rule, subsequently avail himself of the fact that the perceptions he has created do not correspond to his true intentions ...." Id. at 6. Schweizer describes this as "the principle of good faith."[10] Id.
 
 
 50
 Schweizer has offered no authority in which a nonsignatory has attempted to invoke an arbitration clause, much less succeeded in doing so. Moreover, it is noteworthy that Schweizer does not directly conclude that defendants could invoke the arbitration clauses in this case. He concludes, referring to "the non-signatory natural and legal persons" here—that is, defendants—that "it is difficult to imagine an arbitral tribunal convened in Switzerland, declining jurisdiction with regard to these same persons, supposing that they challenged the jurisdiction of an arbitral tribunal over them." Schweizer Aff. 5-6. In other words, a Swiss arbitral tribunal would not decline jurisdiction over defendants, if defendants were to challenge the tribunal's jurisdiction in an arbitration brought by plaintiffs.
 
 
 51
 Defendants argue that the decisions cited by Schweizer—which address whether a signatory can invoke an arbitration clause against a nonsignatory—imply that a nonsignatory can likewise invoke an arbitration clause against a signatory. See Defs.' Supp. Br. at 22-23 (referring to the issue of whether a signatory could compel a nonsignatory to arbitrate as a "more difficult issue" than that presented here). These decisions, however, do not support defendants' conclusion. First, and rather conspicuously, defendants' expert does not draw such a conclusion about Swiss law. Second, the rationale underlying the decisions—which Schweizer describes as "the principle of good faith"—does not require plaintiffs to arbitrate in the instant case. There is no evidence that plaintiffs acted in bad faith or in any way manifested an intent to enter into a contract with the Uzans as individuals. In contrast, the District Court's opinion is replete with findings that defendants repeatedly acted in bad faith. See, e.g., Uzan II, 274 F.Supp.2d at 505 (applying the doctrine of "unclean hands" to bar defendants from equitable relief). In these circumstances, defendants have no basis for invoking a principle of good faith.
 
 
 52
 In sum, even accepting Schweizer's affidavit at face value, it does not materially advance defendants' position.
 
 
 53
 We therefore conclude that under Swiss law, which governs the agreements at issue, defendants, as nonsignatories, have no right to invoke those agreements. We accordingly affirm the District Court's denial of defendants' motion to compel arbitration.[11]
 
 
 54
 
 B. The District Court's Jurisdiction Pending Appeal
 
 
 
 55
 Defendants next argue that their filing of a notice of appeal from the District Court's order denying their motion to compel arbitration deprived the District Court of jurisdiction to proceed. The District Court refused to stay the proceedings, finding that defendants' appeal was frivolous. We hold that, although defendants' appeal was not frivolous, the District Court did have jurisdiction to continue with the case in the absence of a stay from this Court.
 
 
 56
 The Supreme Court has stated that "[t]he filing of a notice of appeal is an event of jurisdictional significance—it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal." Griggs v. Provident Consumer Discount Co., 459 U.S. 56, 58, 103 S.Ct. 400, 74 L.Ed.2d 225 (1982); see also New York State Nat'l Org. for Women v. Terry, 886 F.2d 1339, 1350 (2d Cir.1989) ("[T]he filing of a notice of appeal only divests the district court of jurisdiction respecting the questions raised and decided in the order that is on appeal."). The issue, therefore, is whether the trial of a case on the merits is "involved in" an appeal of an order denying arbitration.
 
 
 57
 The only authority in this Circuit strongly suggests that it is not. In In re Salomon Inc. Shareholders' Derivative Litigation, 68 F.3d 554, 556 (2d Cir.1995), deciding an appeal from the denial of a motion to compel arbitration, we refused to stay the proceedings below, and we "affirm[ed] the decision [of the district court] to proceed to trial." In re Salomon involved a shareholders' derivative suit brought on behalf of Salomon Brothers against several former employees, arising from a Treasury Bill auction scandal. See id. at 555. The defendant employees sought to compel arbitration under the FAA, based on agreements they had signed with Salomon Brothers providing for arbitration of any disputes arising out of their employment. See id. The district court initially granted the motion and referred the matter to the New York Stock Exchange ("NYSE"), the arbitral forum designated in the arbitration agreements. See id. The NYSE, however, declined to arbitrate the dispute, and the defendants went back to the district court, seeking an order compelling arbitration, staying trial pending arbitration, and appointing substitute arbitrators under Section 5 of the FAA. See id. at 555-56. The district court denied that motion, and the defendants appealed.
 
 
 58
 We ultimately affirmed the district court's order denying arbitration, holding that "[b]ecause the parties had contractually agreed that only the NYSE could arbitrate any disputes between them, Judge Patterson properly declined to appoint substitute arbitrators and compel arbitration in another forum." Id. at 559. Prior to our decision, however, the defendants on two occasions asked this Court for a stay of the trial pending appeal, and each time we refused. Id. at 557. We concluded that we would "not disturb Judge Patterson's decision to proceed to trial." Id. at 561.
 
 
 59
 Our decision in In re Salomon plainly contemplated that a district court has jurisdiction to proceed with a case despite the pendency of an appeal from an order denying a motion to compel arbitration. We approved Judge Patterson's decision to deny the defendants a stay pending appeal, and we twice denied the same relief to defendants when they moved in this Court for a stay.
 
 
 60
 Other circuits are divided on this question. The Ninth Circuit has held that an appeal from an order denying a motion to compel arbitration "does not deprive the district court of jurisdiction over other proceedings in the case." See Britton v. Co-op Banking Group, 916 F.2d 1405, 1412 (9th Cir.1990). The Court observed that either the district court or the court of appeals may—but is not required to—stay the proceedings upon determining that the appeal presents a substantial question. Id. at 1412 & n. 8. In contrast, the Seventh and Eleventh Circuits have held that a district court may not proceed after the filing of a nonfrivolous appeal from an order denying arbitration. See Blinco v. Green Tree Servicing, LLC, 366 F.3d 1249, 1251 (11th Cir.2004) ("Upon motion, proceedings in the district court ... should be stayed pending resolution of a non-frivolous appeal from the denial of a motion to compel arbitration."); Bradford-Scott Data Corp. v. Physician Computer Network, Inc., 128 F.3d 504, 507 (7th Cir.1997). Notably, in both Blinco and Bradford-Scott the Courts of Appeals granted a stay of the district court proceedings pending appeal. In no case has a Court of Appeals granted the relief that defendants now seek—undoing a trial because the district court lacked jurisdiction to proceed after an appeal from an order denying arbitration.
 
 
 61
 We now follow In re Salomon Brothers and explicitly adopt the Ninth Circuit's position that further district court proceedings in a case are not "involved in" the appeal of an order refusing arbitration, and that a district court therefore has jurisdiction to proceed with a case absent a stay from this Court.[12]
 
 
 C. Supplemental Jurisdiction
 
 
 62
 Defendants argue next that the District Court could not exercise supplemental jurisdiction over plaintiffs' state-law claims because it had no subject-matter jurisdiction over plaintiffs' federal claims. They argue further that, even if the Court had jurisdiction over the RICO claims, the Court abused its discretion when it exercised supplemental jurisdiction over plaintiffs' state-law claims after both the RICO claims and the other federal claims in the complaint had been dismissed.
 
 
 63
 Defendants' first argument can be swiftly rejected. When our Court directed the District Court to dismiss plaintiffs' RICO claims on the ground that they were not ripe for adjudication, we stated specifically that plaintiffs lacked statutory standing under 18 U.S.C. § 1964(c), rather than constitutional standing under Article III. See Uzan I, 322 F.3d at 135 ("Plaintiffs lack statutory standing under RICO." (emphasis added)).[13] In doing so, we dismissed Motorola's RICO claim on the merits rather than for lack of subject-matter jurisdiction. See Lerner v. Fleet Bank, N.A., 318 F.3d 113, 129-30 (2d Cir.2003) (holding that lack of statutory standing under RICO "is not jurisdictional in nature ... but is rather an element of the merits addressed under a Fed.R.Civ.P. 12(b)(6) motion for failure to state a claim"). We then remanded the case to the District Court to determine "whether to retain supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(c)," Uzan I, 322 F.3d at 137, a step which would have been unnecessary had we believed that the plaintiffs have not suffered the "injury-in-fact" necessary for Article III standing.
 
 
 64
 In any event, it is readily apparent that defendants' dilution and eventual destruction of plaintiffs' collateral amounts to the requisite "injury-in-fact" for Article III purposes, even if that injury is not sufficiently definite for RICO purposes. See Baur v. Veneman, 352 F.3d 625, 632 (2d Cir.2003) (explaining that under Article III, a plaintiff need demonstrate only an "actual or imminent" injury). Here, the injury to Motorola and Nokia was not contingent on any future event, even if the damages stemming from that injury could not be identified with precision at the pleading stage.
 
 
 65
 Defendants' alternative argument—namely, that the District Court abused its discretion when it exercised supplemental jurisdiction over plaintiffs' Illinois claims even after dismissing all the federal claims in the complaint—is more substantial, but it too does not persuade us that the District Court was obligated to decline jurisdiction in these circumstances. The supplemental jurisdiction statute, 28 U.S.C. § 1367, provides in relevant part that
 
 
 66
 (c) [t]he district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if (1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.
 
 
 67
 Under § 1367(c)(3), it is indisputable that Judge Rakoff could have declined to exercise supplemental jurisdiction after we directed him to dismiss plaintiffs' RICO claims and after he dismissed plaintiffs' other federal claims. The issue is whether he was obligated to do so. We review the District Court's decision to exercise supplemental jurisdiction over state-law claims for abuse of discretion. Marcus v. Am. Tel. & Tel. Co., 138 F.3d 46, 57 (2d Cir.1998). When, as in this case, a federal court dismisses all claims over which it had original jurisdiction, it must reassess its jurisdiction over the case by considering several related factors—judicial economy, convenience, fairness, and comity. Nowak v. Ironworkers Local 6 Pension Fund, 81 F.3d 1182, 1191 (2d Cir.1996).
 
 
 68
 Applying these factors, our Court has held, as a general proposition, that "if [all] federal claims are dismissed before trial..., the state claims should be dismissed as well." Castellano v. Bd. of Trustees, 937 F.2d 752, 758 (2d Cir.1991) (quoting United Mine Workers v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)) (emphasis added); accord Giordano v. City of New York, 274 F.3d 740, 754 (2d Cir.2001). However, we have also held that when "the dismissal of the federal claim occurs `late in the action, after there has been substantial expenditure in time, effort, and money in preparing the dependent claims, knocking them down with a belated rejection of supplemental jurisdiction may not be fair. Nor is it by any means necessary.'" Purgess v. Sharrock, 33 F.3d 134, 138 (2d Cir.1994) (quoting 28 U.S.C.A. § 1367, Practice Commentary (1993) at 835).
 
 
 69
 The District Court concluded that "this is a particularly strong case" for retaining jurisdiction because "the Court has not only spent considerable time dealing with the legal issues and becoming fully conversant with the facts but also has conducted a trial on the merits." Uzan II, 274 F.Supp.2d at 497 (emphasis added). We agree. Considering the significant (and probably non-duplicable) judicial resources that the District Court expended to evaluate the enormous record, to craft findings of fact, and to impose remedies, "it would have `stood judicial economy on its head' not to proceed with the state claims" after our remand. Enercomp, Inc. v. McCorhill Publ'g, Inc., 873 F.2d 536, 546 (2d Cir.1989).[14] Indeed, based on reasoning similar to the District Court's, our Court has upheld the exercise of supplemental jurisdiction in situations where far fewer resources were expended before the dismissal of federal claims. See Ametex Fabrics, Inc. v. Just In Materials, Inc., 140 F.3d 101, 105-06 (2d Cir.1998) (holding that the district court did not abuse its discretion in maintaining jurisdiction after discovery and a settlement conference had taken place).
 
 
 70
 Additionally, where, as in the instant case, defendants take affirmative steps to frustrate any potential enforcement of a judgment against them, we perceive a strong "fairness to litigants" argument in favor of maintaining jurisdiction. Cf. Correspondent Servs. Corp. v. First Equities Corp., 338 F.3d 119, 127 (2d Cir.2003) (recognizing "fairness to litigants" as an important consideration under 28 U.S.C. § 1367). The District Court in the instant case found that, in addition to diluting and then cancelling plaintiffs' collateral, defendants have, inter alia, failed to comply with orders to release their foreign bank records, failed to submit proper asset disclosures to an English Court, failed to appear for depositions, and initiated foreign proceedings for the sole purpose of impeding and evading the orders of the District Court. The District Court found also that defendants did not comply with its orders to suspend and then to reverse the process by which plaintiffs' collateral was diluted. Although a district court must, of course, adhere to the requirement that it have original jurisdiction over a federal claim before it asserts supplemental jurisdiction over pendent state claims, see 28 U.S.C. § 1367(a) (providing supplemental jurisdiction over state-law claims that are part of the same case or controversy as claims "within [the district court's] original jurisdiction"), it would hardly be "fair to litigants" for district courts to close their eyes to a plaintiff's dwindling prospects of enforcing a judgment because of a defendant's egregious and obstructive conduct. Here, in light of what the District Court found to be defendants' pattern of concealing and diverting assets, there is every reason to believe that defendants would have exploited any delay associated with the transfer of this case to Illinois. The District Court in no way abused its discretion by preventing defendants from doing so.
 
 
 71
 In response to the District Court's reliance on judicial economy and fairness, defendants claim that the District Court failed adequately to weigh "comity." Specifically, according to defendants, the Court improperly reached out to decide the "novel state law question whether [Motorola's] Illinois fraud claim is ripe." For the reasons stated in the next section, we do not accept the view that the ripeness question is somehow "novel." Therefore, we reject defendants' contention that the District Court was required to decline jurisdiction based on considerations of comity.
 
 
 D. Ripeness
 
 
 72
 The defendants assert that, under Illinois law, Motorola's fraud claims are unripe for the same reasons that the RICO claims were deemed unripe by this Court in Uzan I. See Uzan I, 322 F.3d at 136-37 (directing dismissal of RICO claims because damages were not yet "clear and definite" for purposes of RICO standing). Specifically, according to defendants, the Illinois fraud claims, like the RICO claims, are not ripe because the damages suffered by the plaintiffs will not be "clear and definite" until Telsim defaults on its obligations. We disagree.
 
 
 73
 Under Illinois law, as established by an intermediate appellate court of that state, "absolute certainty concerning the amount of damage is not necessary to justify a recovery where the existence of damage is established." In re Application of Busse, 124 Ill.App.3d 433, 79 Ill.Dec. 747, 464 N.E.2d 651, 655 (1984).[15] By the same token, when such damage is established, "the evidence need only tend to show a basis for the computation of damages with a fair degree of probability." Id. (emphasis added). Thus, in Busse, which involved an action by vendors of land against a purchaser who fraudulently altered a subordination clause in a mortgage agreement, the Appellate Court of Illinois concluded that the plaintiff had a viable fraud claim based only on the willful impairment of collateral. Id. at 657; cf. Hummer v. R.C. Huffman Constr. Co., 63 F.2d 372, 374-75 (7th Cir.1933) (holding that, under Illinois law, a mortgagee need not foreclose the mortgage before bringing a tort action for harm done to the mortgaged property). In the absence of any "persuasive data" that the Illinois Supreme Court would disagree with Busse's holding that the willful impairment of collateral is sufficient to support a fraud claim even without absolute certainty regarding the amount of damages suffered by the plaintiff, we defer to the Busse Court's interpretation of Illinois law. See West v. Am. Tel. & Tel. Co., 311 U.S. 223, 237, 61 S.Ct. 179, 85 L.Ed. 139 (1940) ("Where an intermediate appellate state court rests its considered judgment upon the rule of law which it announces, ... [it] is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise."); see also Comm'r v. Estate of Bosch, 387 U.S. 456, 465, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967) (citing West).
 
 
 74
 In an attempt to graft the heightened RICO standing requirements that we applied in Uzan I onto Illinois law, defendants claim that Illinois law requires Motorola to exhaust their remedies by foreclosing on the collateral that once secured Motorola's loans. This argument, which is merely a variation on the argument that damages must be "clear and definite" before they are cognizable, is rejected by Busse and Hummer. In Busse, the Court stated outright that "there is no reason or authority which would make a foreclosure or a foreclosure and sale on a deficiency judgment conditions precedent to maintaining such action, particularly as here, where the [fraudulent] acts were deliberately committed by defendants ...." 79 Ill.Dec. 747, 464 N.E.2d at 657. In Hummer, moreover, the Seventh Circuit, applying Illinois law, held that a lender's cause of action accrued at the time the defendant injured its collateral, regardless of the status of any foreclosure proceeding. See 63 F.2d at 375 ("[A] foreclosure proceeding might have been instituted, but under the greater weight of authority we think that fact can make no difference."). These decisions of an Illinois appellate court and of the Seventh Circuit are straightforward, and remain the best available readings of state law.
 
 
 75
 Defendants' reliance on City of Chicago v. Michigan Beach Housing Coop., 297 Ill.App.3d 317, 231 Ill.Dec. 508, 696 N.E.2d 804 (1998), is misplaced. In Michigan Beach, a lender sued a debtor for fraud when it discovered that the debtor had misrepresented the number of units pre-sold in a housing project. See id. at 807. The court held that the plaintiff failed to prove damage because, among other things, the loan was not due for 42 years. Id. at 810. The alleged injury in Michigan Beach was wholly "speculat[ive]"; in the instant case, by contrast, defendants have already injured the plaintiffs by destroying the plaintiffs' collateral. Michigan Beach, therefore, serves only to highlight the difference between the type of wholly speculative injury that cannot serve as the basis for a fraud claim, on the one hand, and a claim based on the destruction of collateral and the immediate threat of a pecuniary harm, on the other hand. This case falls squarely in the second category.
 
 
 76
 Because considerations of fairness and efficiency weigh in favor of the District Court's decision, and because the Court did not decide a novel question of Illinois law, we perceive no abuse of discretion in the District Court's decision to maintain jurisdiction over the state-law claims in this case. See Mauro v. S. New England Telecomm., Inc., 208 F.3d 384, 388 (2d Cir.2000) (affirming district court's decision to assert jurisdiction over state-law claims where abstention "would have furthered neither fairness nor judicial efficiency, nor did those [claims] require the district court to resolve any novel or unsettled issues of state law").[16] Accordingly, we conclude that the District Court had the requisite authority to decide plaintiffs' fraud and constructive trust claims.
 
 
 E. Personal Jurisdiction
 
 
 77
 Finally, for substantially the reasons stated by the District Court, see Uzan II, 274 F.Supp.2d at 517-34, 574-77, we hold that the District Court had personal jurisdiction over each of the defendants.
 
 IV. REMEDIES
 
 78
 The District Court imposed an array of remedies after final judgment, including (i) an award of compensatory damages to Motorola equal to the full amount of its loans to defendants plus prejudgment interest ($2,132,896,905.66); (ii) an award of punitive damages to Motorola equal to the same amount ($2,132,896,905.66); and (iii) an imposition of a constructive trust, in favor of plaintiffs, over 73.5% of Telsim's stock, along with an order requiring defendants to turn over those Telsim shares to the registry of the Court. The District Court also declared that plaintiffs could collect their judgments from any of the more than 130 corporate entities that are controlled by defendants.
 
 
 79
 On appeal, defendants do not challenge the award of compensatory damages, nor do they challenge the constructive trust established to benefit Nokia. Instead, defendants challenge (1) the constructive trust over approximately 66% of Telsim's shares to benefit Motorola;[17] (2) the order that defendants turn over those shares, along with the shares held in trust for Nokia, to the registry of the District Court; (3) the order allowing plaintiffs to enforce the judgment against 130 nonparties; and (4) the multi-billion dollar punitive damages award in favor of Motorola.
 
 
 80
 To a substantial degree, we agree with defendants that the District Court has not made findings sufficient to support these remedies. Accordingly, for the reasons stated below, we vacate the constructive trust entered for the benefit of Motorola, the order of the District Court permitting recovery from 130 nonparties, and the punitive damages award, and we remand the cause to the District Court for proceedings consistent with this opinion.
 
 
 81
 
 A. The Constructive Trust and the Turnover Order
 
 
 1. Nokia
 
 82
 As an initial matter, we find no merit in defendants' contention that the District Court could not order defendants to turn over Nokia's shares in Telsim while a presumptively valid Turkish injunction barred Telsim shares from being transferred abroad.
 
 
 83
 In April 2002, Telsim distributors obtained four Turkish injunctions that forbid Telsim shares from being transferred abroad. Two of those injunctions have since been converted into permanent injunctions (in contrast to the Turkish injunctions purporting to enjoin the proceedings in the District Court, which have since been lifted). As defendants point out, it is well established that "a state may not require a person to do an act in another state that is prohibited by the law of that state or the law of the state of which he is a national." Restatement (Third) of Foreign Relations Law § 441 (1987). That rule is "a fundamental principle[ ] of international comity." Ings v. Ferguson, 282 F.2d 149, 152 (2d Cir.1960).
 
 
 84
 It is also well established, however, that orders of foreign courts are not entitled to comity if the litigants who procure them have "deliberately courted legal impediments" to the enforcement of a federal court's orders. Societe Internationale v. Rogers, 357 U.S. 197, 208-09, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958); see also Laker Airways Ltd. v. Sabena, 731 F.2d 909, 939-40 (D.C.Cir.1984) (refusing to respect English court's order where the "defendants involved in the American suit had ... gone into the English courts to generate interference with the American courts"); China Trade & Dev. Corp. v. M.V. Choong Yong, 837 F.2d 33, 36-37 (2d Cir.1987) (citing Laker Airways with approval). Here, the District Court determined that the orders of the Turkish courts were "collusive" and "an overt attempt to interfere with [its] jurisdiction." More specifically, the District Court found, inter alia, that the distributors had no apparent motive to enjoin the transfer of Telsim shares; that the distributors enjoyed a very close relationship with the Uzans; that the timing of the filings in Turkey suggested that they were intended to thwart the District Court's proceedings just before the Court ruled on the preliminary injunction motion; that the suits in Turkey were nearly identical even though they were purportedly filed by different parties; and that the defendants' responses to the distributors' lawsuits were so pathetic that they actually indicated support for the suits. "Most telling of all," according to the District Court, was defendants' concealment of the Turkish injunctions from the District Court and the Court of Appeals.
 
 
 85
 These specific findings are not contested on appeal in any meaningful way, and we have no basis for doubting them. Although defendants baldly assert that the finding of collusion is "clearly incorrect" and "without support in the record," they offer no basis for these assertions. Indeed, they concede that the validity of the Turkish injunctions is merely presumptive, and then fail to explain why the District Court's findings about their conduct are insufficient to overcome any presumption they might enjoy. In light of defendants' failure to explain why the District Court erred when it set aside the operative Turkish injunctions after finding that they were the product of collusion, we could only agree with defendants if there were some per se rule against setting aside or ignoring the orders of foreign courts. Our case law establishes no such rule.
 
 2. Motorola
 
 86
 By contrast, we agree with defendants that the District Court did not adequately support its decision to impose a constructive trust for Motorola's benefit despite awarding money damages to Motorola. Our Court, applying New York law, has held that an equitable remedy such as a constructive trust is appropriate only if "the party seeking relief ... demonstrate[s] that [its] remedies at law are incomplete and inadequate to accomplish substantial justice." Lucente v. Int'l Bus. Machs. Corp., 310 F.3d 243, 262 (2d Cir.2002). Here, the parties' briefs assume that New York law controls this issue, and such "`implied consent ... is sufficient to establish choice of law.'" Krumme v. WestPoint Stevens, Inc., 238 F.3d 133, 138 (2d Cir.2000) (quoting Tehran-Berkeley Civil & Envtl. Eng'rs v. Tippetts-Abbett-McCarthy-Stratton, 888 F.2d 239, 242 (2d Cir.1989)).
 
 
 87
 In their supplemental brief of July 23, 2004, plaintiffs suggest for the first time that Motorola's remedies at law are "inadequate to accomplish substantial justice" because their collateral consists of a unique property interest—namely, a controlling stake in a foreign company whose shares are not publicly traded. See Pls.' Supp. Br. at 28-29 (citing Dobbs, Law of Remedies § 9.3(4), at 596 (2d ed.1993)). We are not well positioned to evaluate this argument in the first instance.
 
 
 88
 In contrast to most of its meticulous findings in this case, the District Court's findings regarding the adequacy of Motorola's remedies at law are neither clear nor specific. At one point, the District Court, albeit in response to a motion to extend the constructive trust beyond the collateral, noted that Motorola "has an adequate remedy at law." Uzan II, 274 F.Supp.2d at 502. Further, in explaining its decision to impose contempt sanctions on defendants if they failed to turn over Telsim shares to Nokia, the District Court also stated that "Nokia has no meaningful remedy for the fraud perpetrated upon it other than the constructive trust," id. at 582 (emphasis added), thus implying that Motorola has such a remedy. Accordingly, although the District Court's extensive findings regarding defendants' conduct in impeding the judgment would seem to support the inference that Motorola needs a constructive trust as much as Nokia, these statements by the District Court suggest otherwise. With that in mind, we believe that the prudent course is to vacate the turnover order insofar as it applies to the shares pledged to Motorola and remand to the District Court for specific findings in support of that order.[18]
 
 
 89
 
 B. Enforcement of the Judgment Against Nonparties
 
 
 
 90
 Defendants argue further that, by allowing the judgment to be enforced against 130 companies purportedly controlled by the Uzans, the District Court pierced the corporate veils of those companies without a sufficient factual basis. Once again, we agree.
 
 
 91
 The District Court relied on a variety of sources to conclude that the Uzan family controls numerous companies. These sources included annual reports, testimony by accountants, and records held by UBS, the Uzans' bank in New York. The Court also relied heavily on a report about the Uzans by forensic accountant Anthony B. Samuel (the "Samuel Report"), which was incorporated by reference into the findings of fact. Samuel concluded, inter alia, that the defendants massively diverted funds from Telsim and that the Uzans controlled "a single group operation" composed of numerous related entities.
 
 
 92
 Despite the evidence of "a single group operation," there is little evidence in the record before us about the specific 130 entities against whom the District Court allowed plaintiffs to enforce their judgment. The Samuel Report in particular mentions few of the 130 companies purportedly controlled by the Uzans, and the other documents relied on by the District Court consist of little more than lists of companies. Like the Samuel Report, these documents are silent as to whether the 130 entities were inadequately financed, failed to observe corporate formalities, or were marked by other indicia of sham entities. In sum, the documents cited by the District Court do not provide the evidence necessary to pierce the corporate veil of 130 separate entities under either New York or Illinois law. See generally Gallagher v. Reconco Builders, Inc., 91 Ill.App.3d 999, 47 Ill.Dec. 555, 415 N.E.2d 560, 563-64 (1980) (summarizing requirements for piercing corporate veil under Illinois law); MAG Portfolio Consult, Gmbh v. Merlin Biomed Group, LLC, 268 F.3d 58, 63 (2d Cir.2001) (same under New York law).
 
 
 93
 In the absence of specific findings that the 130 entities are alter egos of the Uzans, we cannot reconcile the District Court's broad assessment of liability with fundamental notions of due process, including the principle that nonparties must be accorded "an opportunity to be heard and participate in... litigation" that could give rise to a judgment against them. Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 812, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985). Thus, we vacate the District Court's order allowing plaintiffs to collect their judgment from the 130 nonparties, and remand the cause to the District Court with instructions (1) to give notice to any entities against whom plaintiffs' judgment might be enforceable, and (2) to the extent the District Court believes that enforcement of the judgment against any nonparties is appropriate, to make findings sufficient to support piercing the corporate veils of those entities under applicable state law.
 
 
 C. Punitive Damages
 
 
 94
 Finally, defendants claim that the punitive damages award of $2,132,896,905.66 in favor of Motorola violates both the United States Constitution and Illinois law. With respect to federal law, they argue that the award violates the Due Process Clause. With respect to Illinois law, they argue that the award is excessive because it far exceeds the defendants' capacity to pay. We agree with defendants that the punitive damages award, in its current form, cannot be squared with federal or Illinois law. Accordingly, we vacate that award, and remand to the District Court to set a new award that comports with due process and Illinois law.
 
 
 95
 "Elementary notions of fairness enshrined in our constitutional juris-prudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose." BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 574, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). To determine whether a defendant has proper notice of a punitive damages award under the Due Process Clause, the Supreme Court has instructed us to look at three "guideposts": "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damage award; and (3) the difference between the punitive damages awarded by the [factfinder] and the civil penalties authorized or imposed in comparable cases." State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 418, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003) (repeating the three "guideposts" laid out in Gore).
 
 
 96
 As the Supreme Court observed, "`[t]he most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct.'" Id. at 419, 123 S.Ct. 1513 (quoting Gore, 517 U.S. at 575, 116 S.Ct. 1589).[19] The reprehensibility of a defendant's conduct is determined by considering whether
 
 
 97
 the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident. The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect.
 
 
 98
 Id. at 419, 123 S.Ct. 1513 (citation omitted).
 
 
 99
 In the instant case, the District Court made no reference to these relevant factors. Instead, it simply stated without elaboration that "[c]onsidering the reprehensibility of defendants' conduct in this case, the Court perhaps would be justified in imposing an award of punitive damages several fold the amount of actual damages awarded." Uzan II, 274 F.Supp.2d at 581. This analysis is insufficient to support such a substantial punitive damages award in this case, especially in light of the Supreme Court's admonition that "punitive damages should only be awarded [at all] if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence." State Farm, 538 U.S. at 419, 123 S.Ct. 1513.
 
 
 100
 Although we agree with the District Court that, on this record, some punitive damages award is appropriate, we direct the District Court to reconsider the size of that award on remand. In doing so, the District Court should bear in mind that the harm caused by defendants was not "physical as opposed to economic." Moreover, defendants did not directly endanger the health and safety of others (except, perhaps, insofar as they induced Turkish authorities to arrest executives based on trumped up charges), and plaintiffs in this case were arguably not "financially vulnerab[le]." Id. It appears to us, on the basis of the record to date, that only two of the factors mentioned by the Supreme Court—repetition and intent—weigh in favor of punitive damages in these circumstances.
 
 
 101
 Of course, the size of any award in this case should not be based only on how many relevant factors weigh in favor of a punitive damages award. Instead, because defendants inflicted an economic injury, the District Court should consider both the severity of defendants' misconduct, see Gore, 517 U.S. at 576, 116 S.Ct. 1589 (noting that "economic injury, especially when done intentionally through affirmative acts of misconduct ..., can [still] warrant a substantial penalty" (citation omitted)), and the extent to which a punitive award is needed to deter other potential perpetrators. See id. at 582, 116 S.Ct. 1589 (noting that "[a] higher ratio" of punitive to compensatory damages "may ... be justified in cases in which the injury is hard to detect"); see also Ciraolo v. City of New York, 216 F.3d 236, 243 (2d Cir.2000) (Calabresi, J., concurring) (explaining that a function of punitive damages where harm is economic is to deter perpetrators who may not be caught).
 
 
 102
 Quite apart from the constitutional considerations noted above, the punitive damage award must also be reassessed under Illinois law. In Illinois, "before a court can gauge [a proper punitive damages award], it must first gauge the financial position of the wrongdoer." Hazelwood v. Ill. Cent. Gulf R.R., 114 Ill.App.3d 703, 71 Ill.Dec. 320, 450 N.E.2d 1199, 1207 (1983). Based on that principle, one Illinois appellate court has overturned an award of 2% of the proven net worth of a corporate defendant on the ground that it was "excessive in the extreme." Proctor v. Davis, 291 Ill.App.3d 265, 225 Ill.Dec. 126, 682 N.E.2d 1203, 1217 (1997) (overturning an award against a corporation which had demonstrated that it had a net worth of $1.7 billion).
 
 
 103
 Plaintiffs are correct that, under Illinois law, defendants bear "the burden of putting on" relevant evidence of net worth in objecting to a punitive damage assessment. Ford v. Herman, 316 Ill.App.3d 726, 249 Ill.Dec. 942, 737 N.E.2d 332, 339 (2000). Moreover, it is undisputed that, in the instant case, defendants did not put forward any evidence of their net worth.
 
 
 104
 Plaintiffs would have this Court conclude that, once defendants failed to establish their net worth in the District Court, any punitive damages award could be assessed against them under Illinois law. We reject this view. In this case, the District Court was presented with substantial evidence about the Uzans' property interests, and it even cited one item of evidence that purported to quantify the Uzans' net worth—an article in Forbes Magazine that estimated their net worth at $1.3 billion.[20] Nevertheless, having already assessed more than $2 billion in compensatory damages—$800,000,000 beyond defendants' estimated net worth—the Court set punitive damages without any consideration of defendants' ability to pay such a hefty sum.
 
 
 105
 Because the District Court set punitive damages in this case without considering factors that have been deemed relevant by the United States Supreme Court as well as Illinois appellate courts, we vacate the District Court's punitive damages award, and remand to the District Court to recalculate the award. In setting a new award, we instruct the District Court to consider, inter alia, the nature of the harm caused by defendants, the need to deter other potential perpetrators from engaging in activity similar to defendants', and defendants' capacity to pay whatever award is assessed.
 
 V. THE CROSS-APPEAL
 
 106
 In their cross-appeal, plaintiffs argue that the District Court abused its discretion when it denied their motion, pursuant to Fed.R.Civ.P. 15(d), to file a supplemental complaint reinstating their RICO claims. The District Court denied the plaintiffs' motion on the ground that, under our decisions in Uzan I and First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 768 (2d Cir.1994), filing a supplemental complaint would be futile. Cf., e.g., Acito v. IMCERA Group, Inc., 47 F.3d 47, 55 (2d Cir.1995) ("One good reason to deny leave to amend is when such leave would be futile."). On appeal, the plaintiffs argue that they should be permitted to supplement because (1) the RICO ripeness standards articulated in First Nationwide are erroneous and should be reconsidered, and (2) even under those standards, and notwithstanding our previous decision on the issue, they have stated a ripe RICO claim.
 
 
 107
 We are bound by First Nationwide and by our own application of First Nationwide to the facts of this case in Uzan I. Accordingly, we dismiss the cross-appeal as meritless.
 
 VI. CONCLUSION
 
 108
 Judge Rakoff has conducted this sprawling case with extraordinary energy, diligence, and care. We affirm his exercise of subject-matter and personal jurisdiction over the defendants. Specifically, we hold that:
 
 
 109
 1. The District Court correctly denied defendants' motion to compel arbitration, because the arbitration clause was governed by Swiss law, under which a nonsignatory may not invoke an arbitration clause in the circumstances presented here.
 
 
 110
 2. Absent a stay from this Court— which, though sought by defendants, was not granted—the District Court had jurisdiction to proceed with the case pending defendants' appeal from the denial of their motion to compel arbitration.
 
 
 111
 3. The District Court did not abuse its discretion by exercising supplemental jurisdiction over plaintiffs' state-law claims, based on considerations of efficiency and fairness to the litigants.
 
 
 112
 4. The District Court correctly concluded that plaintiffs' fraud claims were ripe for adjudication under Illinois law.
 
 
 113
 5. The District Court properly exercised personal jurisdiction over defendants.
 
 
 114
 In addition, we reject plaintiffs' cross-appeal as without merit.
 
 
 115
 Despite the District Court's skillful and comprehensive efforts, we hold that:
 
 
 116
 6. The District Court failed to make sufficiently specific factual findings in support of certain remedies it awarded.
 
 
 117
 Accordingly, we vacate the District Court's judgment to the extent that it (a) imposed a constructive trust, for the benefit of Motorola Credit Corporation, over 66% of the stock of a company controlled by defendants; and (b) permitted plaintiffs to enforce their judgment against 130 non-parties to this litigation. Additionally, we vacate the District Court's judgment to the extent that it (c) awarded punitive damages to Motorola in the amount of $2,132,896,905.66, and we remand for reconsideration of that award under the Due Process Clause of the United States Constitution and Illinois law, and for any further factfinding that the District Court deems appropriate or necessary.
 
 
 118
 We remand the cause for further proceedings and findings of fact consistent with this opinion.
 
 
 
 Notes:
 
 
 [1]
 Plaintiffs have brought a motion to dismiss this appeal under the fugitive disentitlement doctrine. By an order filed the same day as this opinion, we have denied this motion
 
 
 [2]
 At around the same time as the defendants were defying Judge Rakoff's orders, they were also defying the orders of foreign courts. In 2002, Motorola successfully moved the English High Court of Justice for "freezing orders" prohibiting members of the Uzan family from disposing of assets worldwide. When the Uzans failed to comply, the Court found Hakan and Kemal Uzan in contempt and ordered them arrested and imprisoned if found within the Court's jurisdiction
 
 
 [3]
 In February 2002, Telsim initiated an arbitration against Motorola in the Zurich Chamber of Commerce. Telsim acknowledged its debt, but claimed that under Swiss law, "economic force majeure" resulting from disruptions in the Turkish economy excused its failure to pay. The arbitration has been actively litigated since March 18, 2003. In January 2004, Motorola was granted a final partial award of $85 million against Telsim. This amount has not been paid. A trial on all issues is scheduled for December 2004
 
 
 [4]
 In a separate order dated October 15, 2002, the District Court announced that if defendants did not comply with the preliminary injunction by November 26, 2002, the contempt sanction would increase to $100 million for the month of November and would double each month thereafter. On November 27, 2002, this Court, in docket number 02-7566, stayed this order
 
 
 [5]
 The District Court also entered another wide-ranging injunction that,inter alia, (a) prohibited the defendants from diluting the collateral, (b) directed the defendants to take all necessary steps to dissolve Turkish injunctions "collusively procured" by defendants purporting to prohibit transfer of the collateral outside Turkey, and (c) prohibited the defendants from initiating any legal actions in foreign courts to interfere with the judgment.
 
 
 [6]
 Notably, while the appeal has been pending in this Court, plaintiffs claim that Turkish authorities have discovered that the Uzans used a family-controlled bank to perpetrate a $6 billion fraud on depositors, an amount equal to 3% of Turkey's gross national productSee Metin Munir, Turkey $6bn Bank Fraud Claim, Financial Times, Oct. 6, 2003, at 6. The Turkish government, the plaintiffs attest, has seized the Uzans' companies, including Telsim and the corporate defendants, and is pursuing their assets. Assuming this account is accurate, plaintiffs are now competing with the Turkish government for Uzan assets.
 
 
 [7]
 We note that, even though the individual defendants' and the corporate defendants' interests are not self-evidently aligned in every respect—as reflected by the September 26, 2003 order of this Court dismissing the individual defendants' appeal but not that of the corporate defendants—they have jointly briefed all of the issues
 
 
 [8]
 The District Court also held that, even if defendants could invoke the arbitration clauses, defendants would not be able to compel arbitration with Motorola because the arbitration clauses in the Motorola Agreements were "narrow" in scope (in contrast to those in the Nokia Agreements) and did not encompass Motorola's claimsUzan II, 274 F.Supp.2d at 506.
 
 
 [9]
 Defendants do not claim to be successors in interest to the signatories, Telsim and Rumeli, or argue that Telsim and Rumeli were acting as their representatives in signing the agreements
 
 
 [10]
 Plaintiffs' experts agree that a signatory may invoke an arbitration clause against a nonsignatory in those "exceptional circumstances" where the nonsignatory abuses its rights or acts in bad faith. Karrer Decl. ¶¶ 22-24, 26
 
 
 [11]
 Defendants also argue that, "[a]t the very least, the question [of arbitrability] should have been referred to the Swiss tribunal in the first instance." Defs.' Reply Br. at 12 n. 5. The District Court was not, however, required to refer questions of arbitrability to a Swiss arbitrator. Defendants seem to concede that, under either United States federal law or Swiss law, a court is required to determine, before compelling arbitration or dismissing the action on the basis of an arbitration clause, that the parties have an agreement to arbitrateSee Defs.' Supp. Br. at 24 ("If the question is presented in the first instance to a Swiss court, the court's inquiry is similar to the limited inquiry United States courts make under the FAA. Article 7 of the [Swiss Private International Law of Arbitration] provides that the Swiss court `shall' decline jurisdiction over an arbitrable dispute unless it finds that the agreement is `null and void, inoperative or incapable of being performed.'"). Defendants also assert that "[t]he first task of a court asked to compel arbitration of a dispute... `is to determine whether the parties agreed to arbitrate that dispute.'" Defs.' Supp. Br. at 14 (quoting Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 626, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985)). The District Court therefore properly undertook to determine whether the parties had an agreement to arbitrate.
 
 
 [12]
 Defendants moved for a stay in this Court on November 1, 2002, pending their appeal (in docket number 02-9302) of the District Court's denial of their motion to compel arbitration. This motion was ultimately denied as moot on March 7, 2003, as part of this Court's decision on the merits leaving intact the preliminary injunction issued by the District CourtSee Uzan I, 322 F.3d at 139.
 
 
 [13]
 Specifically, we concluded that because the plaintiffs had not fully exhausted their contractual remedies against Telsim, including foreclosing on the collateral, the damage to the plaintiffs' property interests had not fully crystallizedSee Uzan I, 322 F.3d at 136-37.
 
 
 [14]
 Our decision inKidder, Peabody & Co. v. Maxus Energy Corp., 925 F.2d 556 (2d Cir.1991), where we stated that "[t]he judicial economy factor should not be the controlling factor, and it may be appropriate for a court to relinquish jurisdiction over pendent claims even where the court has invested considerable time in their resolution," id. at 564 (emphasis added), does not compel a different conclusion. In that case, concurrent state court proceedings that implicated the same issues of state law decided by the district court "were moving along and were almost at the discovery stage." Id. Here, by contrast, no concurrent proceeding is pending in Illinois. Moreover, as noted above, "judicial economy" is not the sole factor weighing in favor of supplemental jurisdiction.
 
 
 [15]
 Defendants point to several sentences in theBusse trial transcript suggesting that the plaintiffs in Busse sought rescission in addition to damages. Defendants then argue that the requirement of pecuniary injury does not apply to an action for "unilateral rescission" or avoidance. The problem with this argument is that the appellate court's decision states clearly that "[d]efendants' appeal is limited to the judgment entered against them for punitive and exemplary damages." 79 Ill.Dec. 747, 464 N.E.2d at 655. The court's relevant analysis is then limited to the damages remedy.
 
 
 [16]
 Because certification to the Illinois Supreme Court is not available to us,see ILCS S.Ct. Rule 20, we need not consider whether discretionary certification would be appropriate in a case like this, an issue on which different views might well exist. The law of Illinois is clear enough so that, in view of the unfairness which would result from federal court abstention from exercising supplemental jurisdiction, it is not an abuse of discretion for the District Court to exercise that jurisdiction, and this remains so regardless of one's view of the desirability or non-desirability of certification, were it available.
 
 
 [17]
 At one point in their brief, defendants appear to suggest that they object to Nokia's constructive trust remedy along with Motorola'sSee Appellants' Br. at 76, n. 19 ("Assuming that a constructive trust is for some reason permissible for Nokia's benefit, that trust cannot consist of 73.5% of the Telsim shares...."). However, the arguments put forward by defendants against the constructive trust— i.e., that Motorola has an adequate remedy at law, and that the constructive trust would result in an improper double recovery in light of Motorola's damage award—simply do not apply to Nokia.
 
 
 [18]
 Because we vacate Motorola's constructive trust, we need not address defendants' objections to the turnover order entered in support of that trust, including defendants' claim that the turnover order violates Federal Rule of Civil Procedure 69, which states that the process for collecting a monetary judgment "shall be by writ of execution." We also need not address the claim that Motorola's constructive trust would result in an improper double recovery, because Motorola has been given both the value of its loans and the collateral securing the loans
 
 
 [19]
 The other two "guideposts" do not appear to be relevant here. There is no disparity between the size of the award and the actual harm suffered by the plaintiffs (a 1:1 ratio). Moreover, although the award is 42,000 times the penalty provided by Illinois' Deceptive Business Practices Act, as defendants observe, defendants do not seriously argue that that statute, which protects consumers from,inter alia, false advertising in promotional give-aways, is "comparable" to the common law fraud claims here.
 
 
 [20]
 InFord, by contrast, where the Appellate Court of Illinois held that defendants have the burden of putting on evidence of net worth, the factfinder had been presented with no evidence whatsoever regarding the defendant's net worth. See Ford, 249 Ill.Dec. 942, 737 N.E.2d at 339.